IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


VALERIE JAQUES,

                               Plaintiff,                        Case No. 3:05 CV 7197

                -vs-

                                                   <u>MEMORANDUM   OPINION</u>

LEE HERBERT, et al.,

                               Defendant.

KATZ, J.

This matter is before the Court on the motions of all three Defendants, United Auto Workers Local No. 12 ("Local 12" or "the Union"), DaimlerChrysler AG ("Daimler Chrysler" or "the Company"), and Lee Herbert, for summary judgment (Doc. Nos. 68, 70, and 71), and also on Plaintiff's motion for partial summary judgment (Doc. No. 72), motion to strike (Doc. No. 132), and motion to file a sur-reply *instanter* (Doc. No. 137). All six motions are now decisional.

<u>**BACKGROUND**</u>

DaimlerChrysler hired Valerie Jaques in 1985, to work at non-skilled production operator jobs at the Jeep plant on North Cove Boulevard in Toledo, Ohio. Jaques was a "floater" who was assigned to a particular department but who "floated" around to different jobs to fill in for absent employees. She never had a permanent position of her own. Throughout her employment, Jaques was a member of the United Auto Workers Local No. 12. For at least some of her employment, Jaques was "PQX," meaning she had medical restrictions limiting the work she could do.

In 1997, Jaques filed several grievances about harassment in her workplace. The Union returned the grievances to her, explaining that by filing a "huge number of grievances" she was

"abusing the process." The Union said her grievances were "unclear" and "vague," and encouraged her to refile one single grievance using a "who, what, when, where, and why" format to describe all the harassment. (Doc. No. 76-26). She did not refile. However, also in 1997, Jaques filed a charge with the Ohio Civil Rights Commission ("OCRC") claiming that DaimlerChrysler disciplined her because of her sex. The charge was dismissed.

In January 1998, DaimlerChrysler terminated Jaques for being absent for five days without documentation. Jaques then sought help from the "Employee Assistance Program" ("EAP"). The EAP is a program that is bargained for between DaimlerChrysler and Local 12. The EAP provides assistance to union workers and is staffed by "EAP counselors" who are members of the union and who are appointed to their positions by the Chairman of Local 12. However, EAP counselors are paid by DaimlerChrysler, and the Company keeps track of their working hours and approves their leaves. When an employee seeks EAP assistance, the job of the counselors is to assess their problems and to refer them to outside professionals for help. Employees may turn to the EAP program voluntarily, or may be refereed there by union officials to help them with problems at work.

In 1998, Jaques met with EAP counselor Lee Herbert, who recommended that she participate in a drug rehabilitation program in an effort to get her job back. Jaques completed an outpatient drug rehabilitation program.

In December of 1998, Jaques filed a grievance seeking reinstatement on a last-chance basis. In January 1999, DaimlerChrysler agreed to reinstate her under a last-change agreement that required her to abide by its terms for three years. One of the agreement's terms was that any violation of Company rules would result in immediate discharge. The agreement also required

2

Jaques to "comply with a treatment program as outlined by the plant E.A.P. Representative until the Company and U.A.W. Local 12 are notified that it is no longer necessary for [her] to be in said program," and to provide a bi-weekly report of her progress in the program. (Doc. No. 72-27). Failure to comply with the program was grounds for immediate discharge. Though the agreement Jaques signed said she would be placed in another plant, DaimlerChrysler changed the agreement by interlineation and returned Jaques to the body shop at the North Cove plant as a floater. (Union committeeman Ken Dudley testified that the reference to the other plant was an error.) (Doc. No. 88, pp. 61-65).

In August 2000, a grand jury indicted Jaques for obtaining, possessing, or using the personal identifying information of another with the intent to fraudulently obtain credit, property, services, debt, or other legal obligation. Jaques had used a credit card opened in the name of Joan Limmer, a co-worker, to buy over $7,000 worth of furniture and other items. Jaques claims that though she signed the charge slips, it was her niece (who is the daughter of another DaimlerChrysler employee, Ray Robasser, Jaques's brother-in-law) who somehow opened the credit card account. Jaques pled "no contest" to the fourth-degree felony of taking the identity of another, and was found guilty on February 9, 2001. She was sentenced to seven years community control and required to wear an ankle bracelet. She continued to work.

In October 2000, a grand jury indicted Jaques for misuse of a credit card, for using a card opened in the name of Kathy Burnett, another DaimlerChrysler employee. Jaques pled "no contest" and was sentenced to four years community control, served concurrently with her other sentence.

3

In April of 2001, Jaques's union steward, Tony Everhardt, told her to report to the EAP program because she was, in her words, "having lots and lots of trouble in the body shop," which trouble she described as "I could never do nothing right, the bosses were approaching me yelling at me, I couldn't do my job right, I was paid off [unable to do the work in the body shop], I believe, three times, I believe, out of the body shop." (Doc. No. 76, p. 83). Jaques admits she was overusing Xanax at the time.

Jaques went to the EAP office and met again with EAP counselor Lee Herbert. At that time, April of 2001, Herbert and Jaques began a sexual relationship. Over the course of their relationship, they had sex several times in his office and at a motel. Jaques estimates they had sex in April or early May 2001, two or three times in June 2001, in early August 2001, about three times in October of 2003, once in November 2003, at least once in January 2004, and on February 20, 2004. During their first encounter, which occurred in Herbert's office at the plant, Herbert first tried to have sex with Jaques on a chair. When that proved unwieldy, he left and returned with an exercise mat, and they proceeded on the floor. Plaintiff claims that their encounters often began suddenly, while she was in Herbert's office to discuss her grievance. When asked at her deposition whether at any time she did anything to indicate to Mr. Herbert that his advances were unwelcome, Jaques responded, "I didn't say yes or I didn't say no. They just happened." (Doc. No. 76, p. 268).

During her 2001 referral to EAP, Herbert made the assessment that Jaques was already seeing a therapist and should continue to do so. He testified that he was not aware of her Xanax abuse at the time, and that he did not refer her for any other treatment.

4

After Jaques was convicted of using credit cards in their names, Joan Limmer and Kathy Burnett complained to DaimlerChrysler Labor Relations that Jaques was still employed. It was widely believed that Jaques had gotten the social security numbers necessary to open the credit card accounts from a seniority list taken from the plant. (It was common practice at the time for such lists, which often contained social security numbers to be publicly available in the plant.)

Labor Relations supervisor Jean Hathaway investigated. She interviewed Jaques, who admitted having a seniority list at home, but who claimed it did not contain social security numbers. Hathaway testified that it was rare at the time for such a list *not* to contain the numbers. Jaques denied obtaining the numbers, but admitted that she was "in on the shopping part of it." Hathaway also spoke with assistant Lucas County prosecutor Ellen Hoover, who told Hathaway that Jaques had admitted to a postal inspector that she had taken the social security numbers from the plant. Based on her investigation, Hathaway concluded that Jaques had taken a seniority list with social security numbers from the plant and used it to apply for the misused credit cards.

On June 1, 2001, Hathaway terminated Jaques for committing "gross misconduct," in violation of her 1999 "last-chance" agreement. On June 5, 2001, the Union filed a grievance to protest Jaques's termination.

In August 2001, the grand jury returned a third, unrelated indictment against Jaques. Jaques admitted herself to Toledo Hospital in August 2001 for ten to twelve days for prescription drug abuse treatment. When she left the hospital, she was taken into custody. On October 22, 2001, Jaques pled guilty to the felony she was charged with, which violated her prior probation. She was sentenced to seventeen months in prison. She was incarcerated from October 2001 to May 2003, during which time she wrote Lee Herbert several letters. Herbert responded with two

letters of his own.[1]

_____

[1]

Jaques's handwritten letters to Herbert read:

Dear Lee Herbert,

Hello and How are you? Probably busy as ever. Please write me and give me some hope. Things are going OK in court. I should know the out come by the 22nd or on the 22nd [sic]. I have heard today that I lost my house. My parents had to move my stuff out. I wanted to move but not like this. I did not get unemployment after all. I thought I did. My daughter is with my parents. But they are pretty much done with me too. I feel I barely even have my daughter. Why are things so bad. I know, but I keep wishing it was all a bad dream. It's all my fault because of my [illegilbe]. It's the truth. I plan on getting a job when I get out. I owe so mush money to lawyers court costs and fines to keep me working overtime. At the same time, my daughter needs me. Oh, what I have put her through. Lee I hope your [sic] still with me. Your advice is very good and your [sic] right all of the time. I am being honest. I am not sure where I will live when I get out. Things seem to work out. I don't have any family to take me in. My parents may let me stay, I don't know. I read about Jeep in the paper lately, I hope things work themselfs [sic] out. Lee please send me [illegible] of encouragement [illegible]. I could use it. Love, Valerie.

Dear Lee Herbert,                                                    6-11-02

I hope this letter finds you in good health and spirits. I wrote to you not long ago but I am writing you again to be sure you received my letter. When we last spoke you had a very positive out look on my rehiring. You also stated with back pay. I need to know if you still feel this way about my future at Jeep.

Is there a statute period on this kind of issue?

I myself know my family Barb and Ray Robasser sold me out to save themselves criminally. It was very obvious that they were involved also. You stated under all conditions Ray Robasser should have to been [sic] terminated.

Please let me know one way or the other about my possibilities in the future. Until then I hope to hear from you soon. Sincerely, Valerie Jaques

Dear Lee Herbert,

I hope this letter finds you in the best of health and spirits. I am writing in regards to the status of re-employment after I am release [sic] from ORW.

It is my understanding that you believed I would be re-employed. Has there been any changes that you feel I should know about? I am doing well and feel I am a better person from this experience. Would you please respond to my concerns? God Bless You. Sincerely, Valerie Jaques.

(Docs. No. 71-18, 72-19, 72-20).

(continued...)

While she was in prison, Jaques's union committeeman, Ken Dudley, sent her grievance to

---

[1](...continued)
Jaques also sent one typewritten letter:

August 15, 2002
Dear Lee:
The reason I am writing you is in reply to your June 12th letter, and in concern about the fact that there was no mention of any commitment in writing from Chrysler. Is my job still secure when I am released from prison? Has there been any commitment in writing regarding this at all?
Additionally, do you feel this return to work will be resolved without arbitration? I am asking since you made no mention in your letter.
I miss hearing from you, and am concerned about your injuries. Please let me know how you are doing. I look forward to hearing from you as soon as possible!
Take care. Sincerely, Valerie Jaques.

(Doc. No. 72-21).
Herbert sent one letter to Jaques, typed, on company letterhead:

HI Valerie
I got your letter and was glad to hear from you, you asked for some encouragement and I want you to know I will work with you. Valerie I think we need to present your information to Daryl or Nick [Vuich, Union Chairman] and see what happens. I still feel you have a winner on your hands so don't give up. Vcalerie everybody needs and deserves a second chance. We learn may lessons in life as long as we don't forget what we have learned, every lesson is a teaching tool. Hurry home and stay out of trouble your daughter needs you. I am still very much your friend and will not judge you in any way. LOVE YOU. Lee Herbert.

(Doc. No. 72-17, p. 1)
Herbert also sent a handwritten letter:

Hi Valerie,
How are you, fine I hope. I got your letter about your job and your grievance is still on hold. I feel you still have the right to finish your procedure. While your grievance is on hold, it just means it has not been settled. I was glad to hear from you, and to find out you are doing well. Continue to stay in prayer and God will guide you through.
God Bless You, Lee.

(Doc. No. 72-17, p. 2).

the EAP office to be physically held there during her incarceration. Only a union chairman, vice chairman, or committeeman has authority to put a grievance on hold at the EAP office, and the committeeman, not the EAP counselor, has the authority to reinstate the grievance.

Once Jaques was out of prison, Herbert helped her ask her new committeeman, Jeffrey Powers, to reactivate her grievance. Herbert told Powers that Jaques had gotten her problems under control and would be a good candidate for reinstatement. Powers agreed to reactivate the grievance.

On April 15, 2004, the Union took Jaques's grievance to a third-step grievance meeting with the Company, where Hathaway refused to reinstate Jaques. Due to the evidence of misconduct that Hathaway had, and Jaques's prior work record, Powers decided not to press Jaques's grievance further, and it was settled at the third step. Jaques appealed the Union's decision not to pursue her grievance to the fourth step. Her appeal was to the union membership at large, who were given the opportunity to vote on whether the Union should press Jaques's grievance to the fourth step.

In October 2004, Jaques told Local 12 Chairman Dan Henneman that she and Lee Herbert had engaged in a sexual relationship. Jaques played Henneman tapes of telephone conversations between her and Mr. Herbert that she had recorded. Henneman concluded that the tapes revealed a consensual, friendly relationship and that Herbert had done nothing wrong. He did not tell anyone in DaimlerChrysler management about Jaques's complaint.

On December 3, 2004, the union membership met in two separate meetings, one in the morning for the evening shift, and one in the evening for the day shift. One of the items on the agenda was a membership vote on Jaques's appeal, i.e., on whether the Union should press her

grievance to the fourth step. Jaques won at the morning meeting, but at the better-attended evening meeting, where Joan Limmer spoke out against Jaques, all but three people voted against her. Her appeal was defeated.

Jaques appealed the membership's decision not to reinstate her grievance to the Local 12 Executive Board, which considers only whether the Union handled the grievance and appeal properly, not the merits of the grievance itself. In its January 2005 meeting, the Executive Board found that the Union had properly handled Jaques's grievance. Jaques has appealed that decision, and her appeal is still pending at the international level of the United Auto Workers.

In December of 2004, Jaques filed a charge of discrimination with the OCRC and the Equal Employment Opportunity Commission ("EEOC"). The OCRC dismissed the charge.

Plaintiff filed this lawsuit on April 4, 2005 in Lucas County, Ohio, Common Pleas Court. It was subsequently removed to this Court.

### DISCUSSION

All three Defendants have moved for summary judgment. Plaintiff has moved for partial summary judgment.

*A. Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

9

any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim.  *Id.* at 323-25.  Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2541, 91 L. Ed. 2d 202 (1986) (*quoting* Fed. R. Civ. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position.  *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party."  *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'"

*Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore,

"[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact."

*Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual

issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch*

*Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately,

this Court must determine "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

*B. Sexual Harassment*

    Sex discrimination claims brought under Title VII and Ohio Revised Code § 4112.02 have

substantially identical elements. *Knox v. Neaton Auto Parts Mfg.*, 375 F.3d 451 (6th Cir. 2004)

("Because the prima facie case requirements are essentially the same under the Ohio Revised

Code § 4112.02 . . . Knox's federal and state-law claims of gender discrimination may be disposed

of together."); *Little Forest Med. Ctr. Of Akron v. Ohio Civil Rights Comm'n*, 575 N.E.2d 1164,

1167 (Ohio 1991) ("[F]ederal case law interpreting Title VII of the Civil Rights Act of 1964 . . . is

generally applicable to cases involving alleged violations of R.C. Chapter 4112.").

    Title VII requires victims of discrimination to file a charge with the EEOC within either

180 or 300 days of the challenged employment practice, depending on whether they also file with

a state or local agency. 42 U.S.C. § 2000e-5(e). The 180- or 300-day time period "is akin to a

statute of limitations," *Brown v. Hyperion Seating Corp.*, No. 98-6373, 1999 U.S. App. LEXIS

24305, at *5 (6th Cir. Sept. 27, 1999), and "normally no plaintiff can recover for any employment

discrimination that happened more than 300 days before she brings a charge," *EEOC v. Ford*

11

*Motor Credit Co.*, 26 F.3d 44, 46 (6th Cir. 1994). Section 4112.02 is subject to a six-year statute of limitations. *Cosgrove v. Williamsburg of Cincinnati Management Co.*, 638 N.E.2d 991, 997-99 (1994) (Resnick, J., concurring).

Courts have traditionally recognized two types of sexual harassment: "1) harassment that creates an offensive or hostile environment; and 2) quid quo pro harassment, in which a supervisor demands sexual favors as a condition for job benefits." *Kauffman v. Allied Signal, Inc., Autolite Div.*, 970 F.2d 178, 182 (6th Cir. 1992). While the Supreme Court has instructed that "the labels *quid pro quo* and hostile work environment are not controlling for purposes of establishing employer liability," they are still relevant to the "threshold question [of] whether a plaintiff can prove discrimination in violation of Title VII." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 753, 765 (1998). The Court will therefore utilize those frameworks to determine whether Plaintiff has presented evidence from which a jury could find that any Defendant violated Title VII or Ohio Revised Code Chapter 4112. Plaintiff claims to be the victim of both types of sex discrimination; the Court will consider each separately.

1. Quid Pro Quo[2]

To establish her claim of quid pro quo sexual harassment, Plaintiff must show:

1) that the employee was a member of a protected class; 2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; 3) that the harassment complained of was based on sex; 4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment; and 5) the

---

[2]

 Plaintiff's Title VII quid pro quo sexual harassment claim is barred by the statute of limitations, since all of the actions Plaintiff complains of occurred more than 300 days before she filed her complaint. However, Lee Herbert's alleged sexual advances occurred within the six-year statute of limitations governing Plaintiff's state-law claim.

existence of respondeat superior liability.

*Kauffman*, 970 F.2d at 186. To defeat Defendants' motions for summary judgment, Plaintiff must identify evidence in the record from which a jury could find in her favor on each element of the quid pro quo claim. To prevail on her own motion for summary judgment, Plaintiff must show that a jury could not find other than for her on each element. The parties do not dispute that Plaintiff belongs to a protected class or that the conduct she complains of was based on her sex; they dispute the remaining elements. The Court concludes that summary judgment in favor of Defendants is appropriate on Plaintiff's quid pro quo claim, because Plaintiff cannot show that Herbert's advances were "unwelcome." Additionally, Plaintiff cannot show that her submission to Herbert's advances was a condition for receiving job benefits or the ending of her relationship with Herbert led to company management's failure to reinstate her.

It is agreed that Herbert subjected Plaintiff to sexual advances and requests for sexual favors. However, Title VII and the Ohio Revised Code do not prohibit all sexual advances in the workplace. Only those advances that are "unwelcome," and that meet Title VII's other criteria, are actionable. "The correct inquiry is whether [the plaintiff] *by her conduct* indicated that the alleged sexual advances were unwelcome, not whether her actual participation in sexual intercourse was voluntary." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) (emphasis added); *see also, e.g.*, *Bell v. Berryman*, 2004 Ohio 4708, ¶ 57 (Ohio Ct. App. 2004). "The conduct at issue must be 'unwelcome' in that the plaintiff neither solicited it nor invited it and regarded the conduct as undesirable or offensive." *Bell*, 2004 Ohio 4708, at ¶ 57.

The evidence Plaintiff cites to in support of her claim that Herbert's sexual advances were unwelcome could not support a jury finding in her favor on that element. In her motion for

13

Summary Judgment, Plaintiff cites to her own affidavit, in which she states, about her various encounters with Herbert, "I didn't want to do it, but I did not think I could say no because he was helping me"; "I never wanted to have sex with him and I felt dirty and horrible after each encounter"; "I only had sex with Lee Herbert because he said he would get my job back"; and "I finally realized I had to stop letting Lee Herbert take advantage of me. I kept putting him off. When I stopped letting him have sex, my grievance stopped." (Doc. No. 72-2, ¶¶ 23, 24, 29, 31).

None of these statements constitute evidence that Plaintiff indicated *by her conduct* at the time that Herbert's advances were unwelcome. Moreover, Plaintiff's vague and conclusory statement that she eventually "kept putting him off" contradicts her deposition testimony, in which she stated that she never told Herbert "no" or otherwise indicated that his advances were unwelcome.[3] *See Lanier v. Bryant*, 332 F.3d 999, 1004 (6th Cir. 2003) ("When a motion for summary judgment has been filed, a party cannot create a factual issue by filing an affidavit which contradicts earlier testimony."). It is not sufficient for Plaintiff to simply state after the fact that Herbert's advances were unwelcome. Moreover, Plaintiff's statement that she only slept with Herbert because he said he would get her job back is belied by the fact that she slept with him for the first time before she was terminated.

---

[3]

At Plaintiff's deposition, the following exchange took place between Plaintiff and defense counsel:

> Q. At any time with respect to any sexual contact that you had with Mr. Herbert, did you ever resist in any way?
> A. I didn't say yes and I didn't say no.
> Q. You didn't say yes and you didn't say no. If you didn't say no, did you do anything such as push him away or give him any kind of signal that would indicate to him that any advances were unwelcome?
> A. I didn't say yes or I didn't say no. They just happened.

(Doc. No. 76, p. 268).

In her response to Defendants' motions, Plaintiff quotes from recorded telephone conversations between herself and Herbert, in which she allegedly says, "I'm a little nervous about coming in there [to the plant]" and "the more I put it off the more nervous I get." However, Plaintiff has not made the alleged conversation a part of the record in this case, thus the statements are not properly before this Court. In any event, the piecemeal excerpts Plaintiff quotes do not make it clear what about coming to the plant made Plaintiff nervous.

Plaintiff also cites to the testimony of Sue Stief, a co-worker, which she claims shows that Plaintiff "told her friends that she was not willingly consenting to a relationship with Herbert." (Doc. No. 113-1, p. 27). Even if Plaintiff had told Stief that, Stief's recounting of Plaintiff's statements, to prove that Plaintiff indeed did not welcome Herbert's advances, would be hearsay (as Stief herself astutely acknowledges on page forty-four of her deposition). However, contrary to Plaintiff's assertion, Stief's testimony only reflects that Plaintiff revealed to Stief, after the fact, that she had engaged in sexual encounters with Herbert, and that Stief surmised that Plaintiff was regretful about them. (Doc. No. 111, pp. 42-48).[4] Stief does not state that Plaintiff ever resisted or

---

[4]

Typical portions of Stief's testimony read:

> Q. Okay. And did she tell you that she had dated him and that it was a consensual relationship?
> A. I just know that  – I know kind of details of things that she told me that happened. I really don't know what her reasons, why she was telling me. I feel that she was bothersome [sic] by it.
> . . . .
> Q. What was your understanding of why she was telling you these things?
> A. I don't – I think it was bothersome to her.
> Q. Did she use those words?
> A. I think I could tell the way she was telling me about it. She wasn't talking – you know, bragging about it. She was kind of upset, I believe, about it.
> . . . .

(continued...)

rejected Herbert's advances, or otherwise showed by her conduct that they were unwelcome.

Indeed, the record contains some evidence showing that Plaintiff solicited or invited at least some of Herbert's advances, once driving to the plant to pick him up so they could go to a motel, and signing at least one of the letters she wrote to him from prison "Love, Valerie." Finally, though she admitted in her deposition that she new that she could, Plaintiff never asked to switch to one of the other EAP counselors, Patty Gerkin or Joe McGeary, who would have been in the same position to help Plaintiff get her job back, without demanding sex in return. In sum, Plaintiff has not presented evidence from which a jury could conclude that she indicated by her conduct that Herbert's sexual advances were unwelcome.

Additionally, Plaintiff cannot show that her submission to Herbert's advances was an express or implied condition for receiving job benefits, or that her eventual cessation of their sexual encounters resulted in a tangible job detriment, because Union officials and company management, not Lee Herbert, decided how Plaintiff's grievance progressed and whether she got her job back. Plaintiff's deposition testimony shows that she believed Lee Herbert, as an EAP Representative, would advocate on her behalf, would make recommendations to the decision-makers, and would use his connections to help get her reinstated, but that Plaintiff knew Herbert did not have the power to do so himself.[5] Her letters to Mr. Herbert, set forth in footnote one

---

[4](...continued)
Q. Was she crying?
A. Just kind of embarrassed about it, kind of regretting it kind of feeling I was getting from her, you know.
(Doc. No. 111, pp. 43, 47-48).

[5]
Plaintiff testified as follows:
A. Well, I actually thought Herbert . . . had a lot of power, a lot  authority, he knew

(continued...)

16

above, ask, essentially, "what do you think my chances are," as opposed to "please give me my

job back." Plaintiff therefore has no evidence that her submission to Mr. Herbert's sexual

advances was a condition to her reinstatement, which was in the hands of union officials and

company management, or that her eventual refusal caused those decision-makers to act as they

did.

These failures require the Court to grant summary judgment in favor of Defendants on

Plaintiff's quid pro quo sexual harassment claim. The Court need not address respondeat superior

liability.

2. Hostile Environment

---

[5](...continued)
what he was talking about, he's a smart man, and I thought he had *the connections
to people* and he could do it.
. . . .
Q. Well let's make this simplistic. You knew Lee Herbert couldn't just bring you
back to work by himself, could he?
A. I thought he could, yeah. I thought he – I thought he knew what he was doing.
He told me he could *get me my job back*.
. . . .
Q. How did you think he was going to do that?
A. I thought he was a very intelligent, smart man. I thought that he was in the
position, the EAP rep, *his recommendations held it up*, that's the way I seen it at
that time. . . .
Q. Apparently he told you that he wouldn't be able to *convince Jean Hathaway* to
take you back to work?
A. Right, all we had to do – all we had to do was get it past . . . Mean Jean is what
he called her.
Q. All right. Well, regardless of what he called her, he was telling you that he was
*not at all confident that he could convince Jean Hathaway to take you back* –
A. Right.
Q. – *that he would have to convince somebody higher in management to take you
back*?
A. Right.

(Doc. No. 76, p. 257-60) (emphasis added).

17

To establish her hostile-work-environment claims, Plaintiff must show that:

(1) she is a member of a protected class,
(2) she was subjected to unwelcome sexual harassment,
(3) the harassment was based on her sex,
(4) the harassment created a hostile work environment, and that
(5) the employer is vicariously liable.

*Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005).

Again, no one contests that Plaintiff is a member of a protected class. Likewise, no one has

made an issue of whether the harassment Plaintiff alleges was based on her sex. However,

Defendants argue that Plaintiff was not subject to unwelcome sexual harassment, that the acts

complained of did not amount to an actionable hostile work environment, and that the Defendant

employer and union are not vicariously liable.

It is only "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule,

and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment,'[that] Title VII is violated." *Harris v.*

*Forklift Sys.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65,

67 (1986)) (internal citations omitted). In making this determination, the Court looks to the totality

of the circumstances and considers such factors as "the frequency of the discriminatory conduct;

its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance." *Id*. at 23. "[S]imple

teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to

discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca*

*Raton*, 524 U.S. 775, 788 (1998). "In establishing the requisite adverse effect on work

performance . . . the plaintiff need not prove that his or her tangible productivity has declined as a

18

result of the harassment. The employee need only show that the harassment made it more difficult to do the job." *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir. 1988).

The Sixth Circuit has instructed that "[t]he harassment should be ongoing, rather than a set of isolated or sporadic incidents." *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 351 (6th Cir. 2005). "The plaintiff must show that the working environment was both objectively and subjectively hostile." *Id.* "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview." *Harris*, 510 U.S. at 21.

The requirement that the environment be subjectively hostile means that Plaintiff may not premise a harassment claim on conduct of which she was not aware. *See Wanchik v. Great Lakes Health Plan, Inc.*, 6 Fed. Appx. 252, 262 (6th Cir. 2001). Additionally, where the alleged incidents of sexual harassment are isolated and unrelated, and therefore not part of a "continuing violation," "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." *Amtrak v. Morgan*, 536 U.S. 101, 107-08, 112 (2002).

"Title VII was not meant to create a 'general civility code,' and the 'sporadic use of abusive language, gender-related jokes, and occasional teasing' are not sufficient to establish liability." *Clark*, 400 F.3d at 352. The Sixth Circuit has found in several cases that isolated and sporadic sexual jokes, even coupled with an act of battery or physical touching, did not amount to conduct severe or pervasive enough for the plaintiff's sexual harassment claim to survive summary judgment. *See e.g.*, *Gwen v. Reg'l Transit Auth.*, 7 Fed Appx. 496, 502 (6th Cir. 2001); *Burnett v. Tyco*, 203 F.3d 980, 982 (6th Cir. 2000); *Bowman v. Shawnee State Univ.*, 220 F.3d 456 (6th Cir. 2000); *Stacy v. Shoney's, Inc.*, No. 97-5393, 1998 U.S. App. LEXIS 6659, at *1-3 (6th

19

Cir. 1998).

In *Gwen*, the plaintiff's co-worker twice exposed his genitals to her and approached her while making "rude and inappropriate comments." 7 Fed Appx at 498. The plaintiff saw a psychologist because of emotional trauma brought on because of the sexual assault. *Id*. at 499. The employer disciplined but did not fire the offending employee when the plaintiff reported the incident. The Sixth Circuit found that the plaintiff had not shown that the conduct unreasonably interfered with her work performance and created a hostile working environment, and cited to a similar but more egregious case in which a co-worker "'exposed his genitals to plaintiff, threatened to force plaintiff to engage in oral sex with him, and "stuck a ruler up Plaintiff's buttocks" against plaintiff's will,'" but in which the Sixth Circuit had also found there was no hostile environment. *Id*. at 501 (quoting *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 49 (6th Cir. 1996)).

In *Burnett*, a supervisor placed a pack of cigarettes under the plaintiff's bra strap while telling a story about a woman and made two other suggestive remarks to the plaintiff. 203 F.3d at 981. The Sixth Circuit held, "under the totality of the circumstances, a single battery coupled with two merely offensive remarks over a six-month period does not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment." *Id*. at 985. In *Bowman*, the female supervisor had rubbed the male plaintiff's shoulder, grabbed his buttocks, touched his chest, propositioned him, and threatened him. 220 F.3d at 458-59. Though the Sixth Circuit said that "three of the alleged incidents in this case 'were not merely crude, offensive, and humiliating, but also contained an element of physical invasion,'" and found the allegations to be "serious," it concluded that they were not "severe or pervasive." *Id*. at 464

(quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999)). In *Stacy*, the plaintiff's supervisor made sexually suggestive comments to her continuously over a two-month period, and in one incident touched her breast, but the Sixth Circuit found the incidents did not amount to a hostile work environment. 1999 U.S. App. LEXIS 6659 at *3-4, 10.

Finally, in an Ohio case, the Ohio Court of Appeals found that the defendant's showing coworkers a photo of a naked, overweight woman while asking them whether it resembled the plaintiff to be "deplorable" but not "sufficiently severe or pervasive harassment to be actionable under Chapter 4112." *Hale v. City of Dayton*, No. 18800, 2002 Ohio App. LEXIS 474, at *15 (Ohio 2d Dist. Ct. App. Feb. 8, 2002).

Plaintiff claims the incidents that support her hostile environment claim are the sexual advances of Lee Herbert, and several incidents occurring at unspecified times in the plant, presumably over a period of several years. The Court has already concluded that Plaintiff cannot show that Herbert's sexual advances were unwelcome. As to the remaining acts that Plaintiff herself witnessed and that are not explicitly outside the statute of limitations, Plaintiff cites only her affidavit, in which she states:

> I heard stories about women having sex with men in the plant.
>
> During my employment, I was subjected to unwelcome sexual advances, sexual jokes, gestures, and innuendo. For example, when I worked in the body shop, my team leader, Kevin Ginter, came to my area all the time to bother me. He would come to me, licking his lips, and say "come to the cage [a supply room with a make-shift bed]. It will only take a minute." . . . . Before he was team leader, I once saw Ginter expose his penis and shake it. Two supervisors . . . saw him and laughed.
>
> Thomas Thomas, a line worker in fender assembly in the body shop, dropped his pants and exposed himself, and simulated a sex act behind union steward, Tony Everhardt, who laughed. I sometimes laughed at Thomas out of embarrassment, because he was always doing something crazy and he made sure that I couldn't

21

ignore him.

I saw other workers in the body shop expose themselves, comparing penis sizes. One time, a repairman slapped my but so hard I had to sit down. He kept telling me I should "give up some of that . . . before you get too old and nobody wants you."

Many other incidents happened daily, but I can't remember details.

. . . .

[After termination in 1998 and reinstatement on January 21, 1999] I still had problems with harassment at work. People said my committeeman, Ken Dudley, was saying I had accused him of sexual harassment. Coworkers told me there was a picture hanging in the union office of President Clinton and Monica Lewinsky in a sex act, but with me and Ken Dudley substituted. People still acted out on the floor with constant sexual innuendo, jokes, etc. Men, including hourly workers, managers and union officials, would ask me out even though I said no, slapped me on the buttocks, maintained and displayed makeshift beds for sex in the workplace and spread rumors about me. I found a sexually suggestive picture placed under the tire of my car. I saw men expose themselves on the line.

(Doc. No. 72-2, ¶¶ 5-10, 16).

Plaintiff's evidence suffers from several flaws. First, and foremost, Plaintiff does not specify when these acts occurred and has not shown that any of them occurred within the relevant statutes of limitations. Plaintiff filed her complaint on April 4, 2005. None of the incidents in the body shop occurred within the preceding three hundred days, as required by Title VII. Additionally, there is nothing in the affidavit from which a jury could conclude that the acts occurred before April 4, 1999, as required by the Ohio Revised Code.

Second, Plaintiff has presented no evidence regarding the effect these incidents had on her work, other than to say that she sometimes laughed at them. Third, Plaintiff does not argue that the body shop harassment was unwelcome, nor does she present evidence that she indicated by her conduct that it was. Fourth, the stories Plaintiff heard of others having sex in the plant, of Ken Dudley's comments about her, and of the Dudley-Clinton-Lewinsky photo, are hearsay. Finally,

22

the remaining isolated and sporadic incidents, involving different men at different times, are no more severe than those the Sixth Circuit found insufficient to be actionable in the cases cited above. The Court finds Plaintiff's evidence is not sufficient to create a factual issue for the jury.

*C. Sex Discrimination - Unequal Treatment*

Plaintiff originally complained of disparate treatment in work assignments and in regard to her 2001 termination and the Company's failure to reinstate her and the Union's failure to press her grievance to the fourth step. She does not respond to the Defendants' motions for summary judgment as to the work assignment aspect of her claim with any evidence or argument. Therefore, Defendants are entitled to summary judgment on that aspect of the claim.

As to her termination, Plaintiff identified several men whom she claims were similarly situated but who were reinstated after being terminated, and for whom the Union pressed grievances to the fourth and fifth levels rather than settling them at the third step, as in Plaintiff's case. In the absence of direct evidence of intentional discrimination, Plaintiff must present evidence sufficient to establish a prima facie case of discrimination. If Plaintiff does so, and Defendants articulate a legitimate, non-discriminatory reason for failing to reinstate her and for failing to press her grievance further, Plaintiff must present evidence that those reasons are pretext in order to survive Defendants' summary judgment motions. To make out a prima facie case, "the plaintiff must produce evidence which at a minimum establishes (1) that [s]he was a member of a protected class and (2) that for the same or similar conduct [s]he was treated differently than similarly-situated non-minority employees." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). Additionally:

It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the

23

> "comparables" are similarly-situated in all respects. Thus, to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Id.* (internal citation omitted).

Of the comparables Plaintiff has identified who dealt with her same supervisor, Jean Hathaway, all but one were not under a "last-chance" agreement when they were terminated, and none were convicted of felonies against co-workers. Omar Okdie was terminated by Hathaway while under a last-chance agreement and was then reinstated, but the offense for which he was fired was being an hour and twenty minutes late. Plaintiff has not shown that any of the "comparables" were fired for "gross misconduct" or that they had similar workmanship histories. Moreover, the Court finds the Defendants' belief that Plaintiff had stolen social security numbers from the plant to facilitate her crime to be a reasonable differentiating factor which would distinguish Defendants' treatment of her termination and grievance from others who committed crimes. Plaintiff's evidence fails to make out a prima facie case.

In any event, Plaintiff cannot show that Defendant's proffered reason for treating her as they did was pretext. The Sixth Circuit has:

> [A]dopted an "honest belief" rule with regard to an employer's proffered reason for discharging an employee. Under this rule, as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect. An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied "on the particularized facts that were before it at the time the decision was made."

*Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (internal citations omitted). While Plaintiff denies the veracity of Defendants' belief that she stole the social

security numbers, she has not shown that Hathaway had reason at the time to doubt the Assistant

Prosecutor's statement that Plaintiff had confessed, or unreasonably relied on that fact and the fact

that Plaintiff admitted that she had a seniority list. Defendants are entitled to summary judgment

on Plaintiff's disparate treatment claim.

*D. Disability Discrimination*

Plaintiff claims Defendants violated federal and state disability discrimination law in two

ways. First, she claims DaimlerChrysler "regarded her" as disabled because Hathaway wrote in a

memorandum in 1998, just before the Company fired Jaques for the first time, "we all suspect she

has mental problems." Plaintiff also claims Defendants violated 42 U.S.C. § 12112(d)(4)(A),

which provides that:

> A covered entity shall not require a medical examination and shall not make
> inquiries of an employee as to whether such employee is an individual with a
> disability or as to the nature or severity of the disability, unless such examination or
> inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A). Plaintiff claims Hathaway ordered her to have a medical exam in

1998, and that the requirement in the 1999 last-chance agreement that Plaintiff comply with a

treatment program also constitutes a medical exam for which there has been no showing of job-

relatedness.

1. "Regarded as Disabled"

The ADA definition of "disability" includes "being regarded as" having "a physical or

mental impairment that substantially limits one or more of the major life activities" of the

individual. 42 U.S.C. § 12102(2). Similarly, as used in Ohio Rev. Code § 4112.02, "'disability'

means a physical impairment that substantially limits one or more major life activities ... or being

regarded as having a physical or mental impairment." Ohio Rev. Code § 4112.01(A)(13). "Major

25

Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I).

Hathaway's opinion that Plaintiff had "mental problems" does not amount to proof that Hathaway or DaimlerChrysler perceived Plaintiff as being substantially limited in her ability to perform one of the major life activities listed above. For example, when "working" is the "major life activity" that the alleged or perceived impairment substantially limits:

> The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(I). There is no evidence from which a jury could conclude that Hathaway thought Plaintiff was restricted in her ability to perform a class of jobs or a broad range of jobs.

2. Medical Examinations

In support of her claim that Hathaway sent her for a medical examination in 1998, Plaintiff cites to Exhibit 39 to Hathaway's deposition. However, in that document Hathaway wrote "I'm asking that she *not* be set up with an IME for at least one month . . . ." (Doc. No. 97, p. 40) (emphasis added, although the word "not" may be bolded in the original).

As to the stipulation in her last-chance agreement that Plaintiff attend a treatment program, Plaintiff has not shown that the treatment program amounts to a "medical examination." There is no evidence that the treatment program involved the assessment of Plaintiff's medical condition or the reporting of that condition back to the Company. In any event, the treatment was stipulated because, at least as far as the Company believed, drug abuse was what had interfered with

26

Plaintiff's work, resulting in her unexcused five-day absence.[6] The Court therefore fails to see how the drug treatment requirement was not job-related.

Defendants are entitled to summary judgment on Plaintiff's disability discrimination claims.

*E. Retaliation*

Plaintiff complains that the Defendants retaliated against her after she complained to the Union of sexual harassment by Herbert in October of 2004, in violation of Title VII and Ohio Revised Code Chapter 4112.[7] By that time, the company had already decided not to reinstate her and her grievance was settled. (Indeed, the Company did not find out about Plaintiff's allegations until December of 2004.) However, Plaintiff claims Herbert and the Union sabotaged her appeal to the union membership by engineering a negative vote.

In support of this claim, she cites the following evidence. First, Plaintiff points to her own affidavit, where she states "[union chairman Dan] Henneman stood up and told the membership that I was fired for gross misconduct for using employee credit cards and Social Security numbers. He didn't help me in any way, and it sounded like he wanted the union members to vote against

---

[6]

Jaques testified that she went to a drug treatment program because "I just know that at Jeep one way to get your job back is if you don't have a drug problem, you have to say you do and go through a drug program to get it back," but she also agreed that she "could have" had a problem with abusing Xanax at the time. (Doc. No. 76, p. 109).

[7]

Plaintiff also claims that she engaged in protected conduct when she broke off her sexual relationship with Herbert. However, "even the broadest interpretation of a retaliation claim cannot encompass instances where the alleged 'protected activity' consists simply of declining a harasser's sexual advances . . . . If it were otherwise, every harassment claim would automatically state a retaliation claim as well." *Del Castillo v. Pathmark Stores*, 941 F. Supp. 437, 438-439 (S.D.N.Y. 1996).

27

me. Lee Herbert was there talking to people. The membership voted against me." (Doc. No. 72-2, ¶ 34). She then cites to Herbert's deposition wherein Herbert states that it is his opinion, though he does now know it to be true, that union stewards called Joan Limmer to make sure she would speak out against Plaintiff at the meeting. (Doc. No. 94, pp. 73-74). Plaintiff also cites to her own deposition wherein she states that Joan Limmer told her that union reps called her to make sure she would attend the meeting and oppose Plaintiff's appeal. (Doc. No. 76, p. 169). She also cites to the testimony of her friend Louis Boyer that Herbert threatened him in the hallway during the meeting, but did not tell him how to vote. (Doc. No. 100, pp. 38-42, 117).

> To make out a prima facie case of retaliation, Plaintiff must show that:
>
> 1) the plaintiff engaged in an activity protected by Title VII; 2) the exercise of the plaintiff's civil rights was known to the defendant; 3) the defendant thereafter undertook an employment action adverse to the plaintiff; and 4) there was a causal connection between the protected activity and the adverse employment action.

*Virts v. Consol. Freightways Corp.*, 285 F.3d 508, 521 (6th Cir. 2002). Even if attempting to "engineer" the membership vote is an "adverse employment action," Plaintiff's evidence fails to show that any defendant undertook such an action. First, as the Union points out, Henneman was required to read the reason Jaques was fired to the union membership prior to the vote. And the fact that Herbert was present "talking to people" shows nothing of consequence. Herbert's statement about who called Joan Limmer shows that he lacks personal knowledge, and cannot be considered by the Court. Likewise, Plaintiff's statement on the same subject is hearsay and must be disregarded. Finally Herbert's conversation with Boyer in the hallway is irrelevant to Plaintiff's claim that Herbert and the Union tried to influence the vote on Plaintiff's appeal. Plaintiff has failed to show that Defendants retaliated against her after she complained of Herbert's sexual harassment.

In her motion for summary judgment, Plaintiff also argues that Defendants retaliated against her when she was terminated in 1998, after filing her 1997 grievances and OCRC charge. However, those events fall outside the statute of limitations under both state and federal law. Defendants are entitled to summary judgment on Plaintiff's retaliation claims.

*F. Intentional Infliction of Emotional Distress*

To demonstrate that a jury should determine her intentional infliction of emotional distress claim as to any Defendant, Plaintiff must present evidence from which a jury could conclude that the:

> (1) defendant intended to cause emotional distress, or knew or should have known that actions taken would result in serious emotional distress; (2) [the] defendant's conduct was extreme and outrageous; (3) [the] defendant's actions proximately caused plaintiff's psychic injury; and (4) the mental anguish plaintiff suffered was serious.

*Hanly v. Riverside Methodist Hosp.*, 603 N.E.2d 1126, 1132 (Ohio 10th Dist. Ct. App. 1991). For conduct to be found "extreme and outrageous":

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
>
> The liability clearly does not extend to mere insults, indignities, *threats*, annoyances, petty oppressions, or other trivialities.

Restatement (Second) of Torts § 46 cmt. d (1965), *quoted with approval in Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers*, 453 N.E.2d 666, 671 (Ohio 1983)

29

(emphasis added).

In support of her intentional infliction of emotional distress claim, Plaintiff argues the following. First, she claims the Company made up its story that she stole social security numbers from the plant, without having any reliable evidence, and that the company did not investigate any other employees who might have been involved. Second, she claims the company's preferential treatment of male employees was specifically calculated to cause her emotional harm. Finally, she claims Herbert's unwelcome sexual advances, when he was supposed to be helping her, and his retaliation in the form of engineering a Union membership vote against her constitute extreme and outrageous conduct.

As explained above, Plaintiff has not shown that Hathaway unreasonably relied on the prosecutor's statement and Plaintiff's own admissions to conclude that she stole social security numbers. Also as explained above, Plaintiff has failed to show that the Defendants engaged in disparate treatment, that Herbert's advances were unwelcome, or that he or anyone else retaliated against her. In addition, Plaintiff has presented no evidence of intent to cause her emotional distress. Finally, the Court finds that termination from employment, even if wrongful, is not "utterly intolerable in a civilized society." Defendants' motions for summary judgment on Plaintiff's intentional infliction of emotional distress claim are granted.

*G. Invasion of Privacy*

Plaintiff claims Herbert invaded her privacy when he told Plaintiff's friend Louis Boyer about personal problems Plaintiff was having with her daughter. Boyer testified that he cannot remember what Herbert told him, only that he replied at the time, "you're telling me things that she's never even told me."

30

However, "[t]o prevail on her public disclosure of a private fact claim, [Plaintiff] must establish, inter alia, that private information was communicated 'to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge . . . .'" *Stonum v. U.S. Airways, Inc.*, 83 F. Supp. 2d 894, 905 (S.D. Ohio 1999) (quoting *Seta v. Reading Rock, Inc.*, 654 N.E.2d 1061, 1068 (Ohio Ct. App. 1995)). In *Stonum*, the court concluded that disclosure to one person did not constitute invasion of privacy as a matter of law. Similarly, here, Plaintiff claims Herbert revealed secrets to only one person, who doesn't remember what Herbert told him. Plaintiff has not shown that Herbert communicated her private information to the public at large, or that it is substantially certain to become public knowledge. Summary judgment in favor of Herbert on Plaintiff's invasion of privacy claim is granted.

*H. Negligence*

Plaintiff claims Herbert committed negligence per se by violating an ethical rule preventing licenced chemical dependency counselors from sleeping with their clients, and that the other Defendants negligently supervised Herbert.

1. Negligence of Herbert

Plaintiff's negligence claim fails for two reasons. First, the conduct she accuses Herbert of engaging in (making sexual advances and engaging in sexual behavior) was intentional, not negligent. Second, even assuming that Herbert's conduct in making sexual advances did amount to negligence, there is no evidence that Plaintiff saw Herbert in his capacity as a chemical dependency counselor.

Ohio Revised Code § 4758.23(B) provides:

The codes for [chemical dependency professionals] shall define unprofessional conduct, which shall include engaging in a dual relationship with a client, former

client, consumer, or former consumer; committing an act of sexual abuse, misconduct, or exploitation of a client, former client, consumer, or former consumer . . . .

The regulation promulgated under this section reads:

A licensee or certificate holder shall neither engage in any form of sexual conduct or behavior with clients, nor engage in any form of sexual conduct or behavior with former client for two years, at a minimum, after the cessation or termination of professional services within the client's treatment continuum. The prohibition shall apply with respect to any client of the treatment provider, which employs or retains the licensee or certificate holder regardless of whether the client is or was on the licensee or certificate holder's case load.

Ohio Admin. Code § 4758-8-01(B)(7)(a). "Chemical dependency counseling" means:

[R]endering or offering to render to individuals, groups, or the public a counseling service involving the application of alcohol and other drug clinical counseling principles, methods, or procedures to assist individuals who are abusing or dependent on alcohol or other drugs.

Ohio Rev. Code § 4758.01(E). "Alcohol and other drug clinical counseling principles, methods, or procedures" means:

[A]n approach to chemical dependency counseling that emphasizes the chemical dependency counselor's role in systematically assisting clients through all of the following:

(a) Analyzing background and current information;

(b) Exploring possible solutions;

(c) Developing and providing a treatment plan;

(d) In the case of an independent chemical dependency counselor or chemical dependency counselor III only, diagnosing chemical dependency conditions.

Ohio Rev. Code § 4758.01(B)(1). That phrase also includes "counseling, assessing, consulting, and referral as they relate to chemical dependency conditions." Ohio Rev. Code § 4758.01(B)(2).

Plaintiff has no evidence that Herbert acted as her chemical dependency counselor within

32

two years of their sexual relationship. He testified that when she came to him in 2001, he was unaware of her Xanax problem and did not refer her for chemical dependency counseling or treatment. He merely recommended that she keep seeing the therapist she was seeing. The Company and the Union do not require EAP counselors to be licensed chemical dependency counselors, and there is no evidence that Herbert acted as a chemical dependency counselor when he saw Plaintiff as an EAP counselor in 2001.

For those reasons, Plaintiff's negligence claim must fail as to Herbert.

2. Negligent Supervision

"[A]n underlying requirement in actions for negligent supervision and negligent training is that the employee is individually liable for a tort or guilty of a claimed wrong against a third person . . . ." *Strock v. Pressnell*, 527 N.E.2d 1235, 1244 (Ohio 1988). Because the Court has concluded that Plaintiff cannot maintain her causes of action against Herbert in this case, her negligent supervision claim must also fail.

*I. Ratification*

Plaintiff claims the Union and the Company ratified Herbert's acts by failing to discipline or terminate him, once her allegations regarding his conduct came to light and he admitted their sexual relationship. However, even if Plaintiff had presented evidence sufficient to prove Herbert engaged in tortious acts, failure to terminate an employee, or, this Court would add, failure to discipline that employee, after learning of his misconduct, does not constitute ratification. *Amato v. Heinka Ltd.*, 2005-Ohio-189, ¶ 15 (Ct. App. Jan. 20, 2005); *Fisher v. Hering*, 97 N.E.2d 553, 556 (Ohio Ct. App. 1948). Moreover, there is no evidence that Herbert's complained-of acts were done in or were intended to be done in the Company's or the Union's interest. *See Amato*, 2005-

33

Ohio-189, at ¶ 14 ("[T]he touchstone of any ratification argument in the context of respondeat superior is whether the employer derived a benefit from the employee's actions."); *Fisher*, 97 N.E.2d at 556 ("In order to constitute one a wrongdoer by ratification, the original act must have been done in his interest, or been intended to further some purpose of his own.") (internal quotation omitted)). Defendants are entitled to summary judgment on Plaintiff's ratification claim.

*J. Motion to Strike*

Plaintiff has moved to strike several categories of evidence. First, she urges the Court to strike evidence of her past life failures. The Court has not considered this evidence, so Plaintiff's motion as to it is denied as moot.

She next urges the Court to strike all reference to her stealing social security numbers from the plant. Whether Plaintiff actually did so is irrelevant; what matters for the purposes of deciding the motions now before the Court is whether Jean Hathaway's belief that Plaintiff did so was reasonable, based on the facts then at hand. The Court has found that Hathaway reasonably relied on a statement from an Assistant Prosecutor. Plaintiff's motion as to the social security numbers is denied.

Plaintiff next moves to strike evidence of the theft offense that sent her to prison. The Court mentions that offense only to explain that Plaintiff was unavailable for work and her grievance was on hold for a period of time. The particulars of the offense are irrelevant, and Plaintiff's motion is granted in part on that issue.

The Court has not considered testimony from Plaintiff's workers' compensation proceeding, or the supplemental discovery Defendants filed on March 21, 2006. Plaintiff's motion as to those subjects is denied as moot.

34

Finally, Plaintiff's motion is granted regarding the letter to Herbert from the Chemical Dependency Board finding that he did not engage in misconduct: that letter shall not be admitted to show that Herbert in fact did or did not engage in misconduct.

*K. Motion to File Sur-Reply*

Plaintiff's motion to file a sur-reply *instanter* is granted. The document, which was attached to the motion and which the Court has reviewed, is deemed filed.

CONCLUSION

Based on the foregoing, Defendants' motions for summary judgment (Doc. Nos. 68, 70, and 71) are granted. Plaintiff's motion for partial summary judgment (Doc. No. 72) is denied. Plaintiff's motion to strike (Doc. No. 132) is granted in part and denied in part as stated herein, and Plaintiff's motion to file a sur-reply *instanter* (Doc. No. 137) is granted, and the document is deemed filed.

IT IS SO ORDERED.

   *S/ David A. Katz*    <br>
DAVID A. KATZ<br>
U. S. DISTRICT JUDGE
